Robert Harry **GROVES**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 17765.

United States Court of Appeals Eighth Circuit.

April 15, 1965.

Claude Hanks, Clayton, Mo., made argument for appellant and Charles M. Shaw, Clayton, Mo., filed brief.

Robert J. Koster, Asst. U. S. Atty., St. Louis, Mo., made argument for appellee and filed brief with Richard D. Fitz-Gibbon, Jr., U. S. Atty., St. Louis, Mo.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

After executing written waiver of trial by jury, appellant was tried, convicted and sentenced to three years' imprisonment for violation of § 657, Title 18, U.S.C. Only the Government presented evidence leading up to that conviction and sentence of appellant. Now he asserts five assignments of error to have his conviction and sentence vacated. Legally, all such are embraced in this single proposition: The Government failed to establish by the evidence adduced at his trial that he did violate the above-cited statute, or any other law of the United States. That, of course, demands a detailed statement of the facts established at appellant's trial be here made.

Appellant was an employee of Mutual Federal Savings and Loan Association (Association) of University City, Missouri, from June 15, 1962 to December 5, 1963. At all times here material, he was Branch Manager of the "Olivette" branch of that Association. As such, appellant among other things was authorized to accept deposits for savings accounts and issue passbooks therefor evidencing liability of the Association to depositors. The passbooks so issued contained a certification, signed by the officer of the Association accepting the deposit, which certified that the named depositor was a member of the Association and held a savings account therein.

While so employed appellant became acquainted with one Robert Wells. Being aware of appellant's occupation,

Wells opened a substantial savings account with the Association through appellant. That account is not at issue here. Subsequently, and prior to June 15, 1962, Wells and appellant discussed means of increasing Wells' return on his investments beyond the current rate then being paid on savings accounts. Wells testified that appellant proposed that he deposit certain amounts of money with the Association, in return for which he would receive the current interest rate, and that the Association would then use these funds to purchase deeds of trust or second deeds of trust to mature in one, two or three years. Appellant led Wells to believe that at the time of such maturities he would receive a bonus sufficient to make the return on his investment approximately eight to ten per cent. In the period between June 15, 1962, and December 5, 1963, Wells gave appellant ten (10) checks for varying amounts, totaling $20,855.00, all made payable to the Association. These checks were delivered to appellant at various places away from the business offices of the Association. Wells testified that his intention was that these checks were to be deposited in savings accounts, to be used by the "bank" (Association) in the scheme outlined above In return for these checks appellant gave Wells nine (9) passbooks issued in Wells' name and reflecting the amounts of such deposits. From time to time, Wells returned the passbooks to appellant who purportedly entered the current interest on the deposits in the books. Wells received no passbook for the tenth check delivered to appellant as the preparation of the tenth passbook was the precipitating factor in bringing appellant's scheme to light and causing him to lose his position with the Association.

The evidence is undisputed that all the checks here mentioned were made payable to the Association, and upon receipt thereof Wells would deposit the same in the Association, but in accounts in his own name rather than in Wells' name. In so doing, appellant followed the procedure of making a ledger card in his own name and issuing himself a passbook reflecting the deposit. Thus, the amount of such deposits was correctly entered in the records of the Association. This was made possible because the checks were issued payable to the Association, and gave no notice on their face as to the specific account for which they were intended. In each instance, appellant withdrew the funds from the Association shortly thereafter, and deposited the amounts thereof to his own name in the Commercial Bank of St. Louis County. Shortly after each deposit was so made appellant would prepare an unnumbered and pre-dated passbook in Wells' name and deliver it to him, thus leading Wells to believe that his funds were, in fact, deposited in the Association. To allay any suspicion on Wells' part, appellant made spurious interest entries in the spurious passbooks issued to Wells from time to time. In preparing passbooks in Wells' name, appellant prepared no corresponding ledger card, which kept Wells' name from appearing in the records of the Association, nor did he enter the amounts shown in the passbooks on the daily receipts of the Association, thus preventing any shortage from appearing on the books of the Association.

Appellant's scheme came to light in December, 1963. On December 4th, an employee of the Association observed appellant issuing a new passbook for $2,000.00, without recording the amount in the daily receipts. This was done on a cash register in the Association's office, and appellant had turned the date back to September 27, 1963, the date Wells had given him the check for $2,000.00, for which this spurious passbook was issued. This represented the ninth check, the proceeds of which had already been withdrawn from the Association's accounts and deposited to appellant's name; thus converted by him. The employee who witnessed this transaction made a notation thereof on the cash register tape at that time. On December 5th, appellant opened the tenth account in his own name, using for that purpose Mr. Wells' tenth check which also was for $2,000.00. He immediately withdrew $1,500.00. Another employee, who was aware of the

suspicious transaction witnessed on the previous day, reported this latest occurrence to the Association's bookkeeper which led to appellant's discharge, *ante*.

It appears that the proposed scheme of purchasing deeds of trust with the resulting increase in return to Wells was purely a subterfuge on appellant's part to induce Wells to entrust his funds to appellant which, after being deposited with the Association, *ante*, appellant immediately converted to his own use. (All but $500.00 of the amounts appellant deposited with the Association in his name was withdrawn by him within a short time thereafter.) Under the above state of facts, the District Court found appellant guilty of the federal offense, i. e. of a violation of 18 U.S.C., § 657, which provides that anyone:

> " * * * being an officer, agent or employee of or connected in any capacity with * * * any * * savings and loan corporation or association authorized or acting under the laws of the United States * * or * * * the accounts of which are insured by the Federal Savings and Loan Insurance Corporation * * * (who) embezzles, abstracts, purloins or willfully misapplies any moneys, funds, * * * or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than five years, or both * * *."

The substance of appellant's contentions here is that the above-established facts appearing in the record of this case are insufficient to support his conviction under the above statute.

Appellant does not assert his innocence under the evidence here adduced. Rather, he argues that the above facts might well constitute an offense cognizable under state law, due to the relationship established between him and Wells; but he asserts no federal violation can be inferred therefrom. Specifically, it is appellant's contention that in receiving and dealing with Wells' money he was acting as Wells' agent, not as agent of the Association, and, therefore, the funds here considered never became the property of the Association and hence never lost to it. That is, it is his contention that Robert Wells' money never became part of the "moneys, funds and credits" of the Association and under such a state of facts appellant could not be guilty of embezzlement as denounced as a crime by the statute, *ante*.

We do not understand appellant to assert that as between him and Wells there was a specific understanding that he was to act solely as Wells' agent with reference to the checks made payable to the Association; and from the testimony adduced by the Government in the case at bar, no such view of the factual situation here established could reasonably lead one to make any such inference. The only proper inference here is that appellant recognized he did not intend to deal with Wells, personally, and this is augmented by the elaborate scheme concocted by appellant to convince Wells that his money had in fact been properly deposited in a savings account with the Association.

There is no basis in the record of this case that appellant was acting as Wells' agent, factually or by operation of law; that is, that in dealing with Wells he was acting without the apparent scope of his authority as the agent of the Association. Appellant's relationship with the Association when he received the funds in question is not disputed. It is abundantly clear that Wells considered he was dealing with the Association through appellant and not dealing with appellant, personally. That he was justified in this belief is legally substantiated by a consideration of these facts. Appellant was an officer and agent of the Association and was specifically authorized to receive funds on behalf of the Association for deposit to savings accounts, and issue passbooks in receipt therefor. He had previously accepted funds from Mr. Wells which had been properly deposited in an account. He held himself out as so acting in his capacity as an official of

the Association when accepting the funds here in question from Wells, and went to great length to maintain that fiction. The fact that the funds were delivered to him by Wells at places away from the business offices of the Association would appear to have little relevancy in view of the other circumstances which lent credence to his front as then acting on behalf of the Association. An analogous situation is found in Spencer v. United States, 169 F. 562 (8 Cir., 1909), where allegedly embezzled funds were delivered over to a bank's agent at places away from the business premises, but the conversion of these funds was still held to constitute embezzlement from the bank. In the light of the foregoing, there is no merit to appellant's contention that he was unauthorized, and legally could not have been acting as the agent of the Association when he embezzled the funds here considered. (cf.) Wasmann v. City Nat. Bank of Knoxville, Tenn., 52 F.2d 705 (6 Cir., 1931).

 The gravamen of the offense here charged is embezzlement. Generally, embezzlement is " * * * the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895). This Court has approved a statement of the crime of embezzlement by an agent as " * * * the receipt by an agent such as defendant, of money of his principal, and conversion of the funds to his own use. * * *" Berra v. United States, 221 F.2d 590 (8 Cir., 1955). This is in accord with the general holdings on this subject. cf. 29A C.J.S. Embezzlement § 8.

The crux of appellant's argument here is this: He says the funds in question at no time became part of the "moneys, funds and credits" of the Association, and thus he cannot be found guilty of embezzling from the Association, even though he converted the funds to his own use. That there is no merit to that contention is revealed by a consideration of the facts related in the case of Geiger

v. United States, 162 F. 844 (4 Cir., 1908), where the cashier of a national bank received a check to be used to pay at maturity a note which had been discounted by the bank. Without depositing the check in the bank, the cashier caused it to be negotiated and converted the proceeds to his own use. Certain language of the Court in that case is apropos here. It is noted that the check came into the cashier's possession:

" ' * * * by virtue of his position as cashier'. * * * Under such allegations (the Court said), although the check may have been payable to bearer or to (the cashier), it seems to us necessary to consider that (the cashier) obtained the check as agent of the bank, that the check was in possession of the bank, and that the loss growing out of his misapplication of the proceeds was the loss of the bank. It was consequently the money of the bank that the defendant illegally abstracted and misapplied. *The facts alleged cannot constitute a mere breach of trust by (the cashier) as agent of the maker of the check * * *."* 162 F. 847, 848 (Par. and emp. added).

In United States v. Jenks, 264 F. 697 (D.C.E.D.Pa., 1920), several employees of the Federal Reserve Bank of Philadelphia were prosecuted for embezzling from the Bank. The subject of the embezzlement was 4¼% Liberty Loan Bonds which the bank had received from the Treasury Department in order to exchange for certain 4% Liberty Bonds should the holders thereof elect to take advantage of an offer by the Treasury to tender their 4's in exchange for 4¼'s. The defendants there contended that they should have a directed verdict of not guilty as the bonds were not part of the funds and credits of the Federal Reserve Bank, * * * the relationship between the Bank and the Treasury Department being bailor-bailee as far as these bonds were concerned, and the ownership of the bonds residing in the United States. The Court, in denying this

motion, stated that the defendant's employment:

"* * * was such that the bonds came into his possession, and in taking them out he committed a breach of the * * * trust reposed in him by reason of his employment. It is not material that the bonds belonged to the United States * * for between the defendants and the bank the bonds belonged to the bank * * * and the defendants cannot be heard to say in their defense that the bonds * * * belonged to anyone but the principal." 264 F. 698, 699.

The case on which Jenks is based, and which clearly states this proposition, is United States v. United States Brokerage & Trading Co., 262 F. 459 (D.C.S.D.N.Y., 1919).

Ismert-Hincke Milling Co. v. United States, 246 F.2d 754 (10 Cir., 1957), involved a situation where an agent of the Milling Company entered into a contract to deliver wheat to a customer, which was within the scope of his authority. The agent, however, induced the customer to remit payable to another company which was merely an *alter ego* of the agent who misappropriated the funds. The Court held that the agent had received the funds on behalf of his principal, regardless of the fact that he was the payee, and thus the offense constituted embezzlement from the principal.

A case particularly worthy of note is that of Wasmann v. City Nat. Bank of Knoxville, Tenn., supra. In that case a bank cashier induced certain depositors to turn funds over to him, ostensibly so that the bank could purchase and hold notes for the depositors, thus increasing the return on their investments. It should be mentioned that such brokering on the part of the bank was prohibited by law and was in fact merely a subterfuge on the part of the defendant. The cashier issued receipts to the depositors purportedly evidencing the fact that the money had been used to purchase notes and that the notes were being held by the bank. In each instance no such loans were made, and the cashier converted the funds. The action was by the defrauded parties against the bank, and the trial court directed a verdict for the bank on the basis of the bank's want of power to engage in such transactions, which the Court ruled resulted in the actions of the cashier being beyond the scope of his authority and thus not binding on the bank. The Court of Appeals for the Sixth Circuit disagreed and held that the bank was liable for the funds. The Court stated:

"* * * In (the cashier's) individual capacity and with (the depositors') consent he could lend their money without making the banks responsible. But if from the outset (the cashier) intended to perpetrate a swindle, to secure and use the deposits instead of lending them, then in so securing them he acted in the capacity of cashier under color of his position, and not as agent of the plaintiffs * * *. The means he employed to get the funds would not be important." 52 F.2d 707 (Par. added).

It is of special note here that the part of the payments for the purported loans there, were made by check payable to the cashier personally, but the Court still found liability on the part of the bank, relying particularly on the receipts issued for the funds by the cashier.

The same defense as here made by appellant was interposed to a charge of embezzlement by a bank cashier who converted the proceeds of a check which he had received in his capacity as cashier to be deposited to a named account, and this Court disposed thereof in line with the above cases in Wherrell v. United States, 18 F.2d 532 (8 Cir., 1927). See also Spencer v. United States, supra, and Bishop v. United States, 16 F.2d 406 (8 Cir., 1926). The case of Hudson v. United States, 55 F.2d 591 (8 Cir., 1932), is also enlightening, as there a bank officer charged with embezzlement was clearly acting in another capacity when he misapplied funds delivered to him in such other capacity. The case is dis-

tinguishable on this ground and serves to point up the fact that the present appellant was dealing with the funds here in question as an agent of the Association rather than in some separate, individual capacity.

■ The above cases all involve certain common elements present in the record here before us: (1) an officer or agent of a banking concern * * * (2) who receives funds or other property by virtue of his position with the bank * * * (3) and who converts the property to his own use rather than depositing it or paying a note with it, is guilty of embezzlement. In each instance a question arose as to the ownership of the property, and in each instance it is noted that, *as between the principal and the agent,* the agent will not be heard to dispute the ownership of embezzled funds. This has been stated in the terms of an estoppel * * * the agent may not deny that his principal owned the funds when the funds came into the hands of the agent solely by virtue of the special trust and confidence reposed in him because of his position with his principal and who subsequently violates that trust by converting the funds to his own use. As said in State v. Gould, 329 Mo. 828, 46 S.W.2d 886–889:

> "Where a defendant, by his own criminal acts, has placed himself in * * * a position that the evidence will support a conviction on either one of two theories, such as embezzlement by agent, or obtaining money by false pretenses, (it is no part of the duty of a) court to draw fine hair-splitting distinctions and ascertain just at what moment the criminal intent was formed."

Cf. 29A C.J.S. Embezzlement § 8.

Realizing that some of the above-cited cases deal with commercial banking concerns which are governed by totally different statutory law than that which governs federal savings and loan associations, we consider the general law stated therein equally applicable here. In both instances the opportunity to convert the funds arises by virtue of the defendant's

position as the agent of a concern to which the public is invited to entrust its money, and it is in the integrity thereof which the public has confidence. In such instances the funds are delivered up to the agent solely for the purpose of performing a function within the apparent scope of his authority which would inure to the benefit of the drawer of the funds, if deposited in the Association as contemplated by fact and law. Thus in both instances the defaulting agent shall not be heard to question his principal's ownership of the funds where he has so betrayed his trust as to funds which come into his hands by virtue of his position.

The judgment appealed from is affirmed.